Stackhouse v. Horton.

FRANCIS A. STACKHOUSE and others *vs.* SILAS HORTON and others.

In questions of testamentary capacity the abstract opinion of any witness, medical or of any other profession, is not of any importance. No judicial tribunal would be justified in deciding against the capacity of a testator upon the *mere opinions* of witnesses, however numerous or respectable. The opinion of a witness must be brought to the test of facts, so that the court may judge what estimate the opinion is entitled to.

Testamentary capacity is to be ascertained by the court by the application of certain rules of law in the exercise of a sound discretion regulated by these rules.

A monomaniac, under certain circumstances, may make a valid will.

A person may be the subject of a partial derangement towards a particular individual, and this derangement may be the cause of depriving such individual of the bounty of a testator, and yet a will made by such person may be valid; the court will not refuse probate to such will, unless by doing so the person concerning whom the delusion existed will be benefited.

Costs to be allowed in matters of probate.

In the matter of proving the last will and testament of Esther Horton, deceased; appeal from the Orphans Court of the county of Morris.

*J. J. Scofield* and *Whelpley*, for appellants.

*T. Little* and *A. O. Zabriskie*, for appellees.

THE ORDINARY. The decedent, Esther Horton, died in February, 1852. She was upwards of seventy years of age. She had been feeble in bodily health for seven or eight years prior to her decease. During the last four months of her life her decline was rapid. Her disease was an affection of the lungs. It finally assumed the shape of consumption, of which she died. For the last three years of her life she was deprived of her sight—most of that period totally blind. Silas Horton, her husband, died in December, 1842. There was no issue of their marriage. It nowhere appears, in the

Stackhouse *v.* Horton.

voluminous testimony taken, what relatives Silas Horton left
at his decease. The numerous individuals by the name of
Horton mentioned in the paper offered for probate, and
others by that name connected by the evidence with this case,
are the blood relations of Esther Horton. Whether they
were of any relationship to Silas Horton, deceased, does not
appear. Silas Horton died seized of a large real and per-
sonal estate. His personal property was inventoried at nearly
twenty-nine thousand dollars. Of this his widow received,
by his will, about sixteen thousand dollars, and the real es-
tate devised to her is valued at upwards of ten thousand dol-
lars. She died seized of the same real estate devised to her
by her husband; and the personal property which she re-
ceived under the will of her husband accumulated in her
hands, so that the amount, at the time of her death, exceeded
twenty-one thousand dollars. The disposition made by her
of this real and personal property by the paper writing pro-
pounded for probate is the origin of the present controversy.

Esther Horton left a paper writing, bearing date the 13th
day of January, 1852, purporting to be her last will and
testament; and it was offered for probate in the surrogate's
office of the county of Morris by Jacob H. Crammer and
William Logan, named therein as executors. Four caveats
were filed. One by Silas Horton, who is a nephew of the
decedent, but not one of her next of kin, his father, Aaron
Horton, being alive; Aaron Horton, a brother of decedent;
Susan McCollum, a sister, and Curtis Coe, a nephew and
one of the next of kin, each filed a caveat.

After a protracted investigation before five judges of the
Orphans Court of the county of Morris, that court (two of
the judges dissenting) adjudged and decreed that the instru-
ment offered for probate is not the last will and testament of
the said Esther Horton, deceased, and probate thereof was
denied by the court. The court did further order that the
costs of both parties to the litigation before them should be
paid out by the estate. The court taxed the costs for the
services of the judges at two dollars a day, each, making

$690; for the counsel of the will $1250; and for the counsel of the caveators $1250. The surrogate's fees are taxed at $296, including $20 for reading the depositions; sheriff's fees for serving citations $21.64; stationery is charged $16.52. These expenses are independent of the witnesses' fees, which were ordered to be paid, but the amount of which I do not find carried out in the bill of expenses. The whole amount of costs is nearly four thousand dollars.

From these orders an appeal was taken to this court. I must determine whether the Orphans Court was right in refusing this writing probate; and it is my further duty to decide whether the costs taxed by that court shall be paid out of the estate.

The caveators object to the writing offered as the last will and testament of Esther Horton, as follows, on the ground—

1st. Of the general incapacity of the decedent to make a will at the time of the execution of this paper.

2d. That if of sufficient general legal capacity, yet the decedent was the subject of monomania in reference to one of her relations, who had claims upon her bounty, so warping her affections and understanding as to prevent her making a disposition of her property in conformity with her real affections and her moral obligations.

3d. That the execution of the paper was the result of improper influence and fraud.

The witnesses who express opinions unfavorable to the capacity of the decedent to make a will, as well as the facts upon which their opinions are based, are few, notwithstanding the unusual amount of evidence that has been pressed into the case, the larger part of it wholly irrelevant, and which should not have been admitted by the court. It is not contended, nor was any effort made to prove that the decedent was *naturally* a woman of feeble intellect. On the contrary, the whole evidence taken on both sides shows that she possessed at maturity rather a strong mind. She was self-willed, impetuous, and unusually susceptible to prejudices. She had an opinion of her own, in state as well as

domestic affairs, and her opinions in these matters were neither singular or erratic. Her business capacities are abundantly proved by the fact, that she maintained always, even up to the day of her death, the control and management of the estate left her by her husband, selecting her own agents to aid her without any dictation from others, and herself directing those agents, and they submitting to her judgment, without ever questioning its propriety. But it is contended that her mind began to fail her soon after the death of her husband; that from that time her body began to yield and give way to a slow but a steady and wasting disease, and that with her body there was a natural decay of her intellect, which became so feeble, during the last few months of her existence, as to deprive her of those qualities of mind which capacitated her for the important duty of disposing of her property by a last will and testament.

That the mind of the decedent was broken, impaired, and shattered by disease, is beyond question. But with such a standard of capacity, very few who had reached the age of three score and ten years would be deemed competent to make a final disposition of their property. Did the decedent *comprehend* the act she was performing? And was her mind strong enough to form a fixed intention, and to summon her scattered and enfeebled thoughts, so as to enable her to execute that intention? If she did not comprehend the act, or, if comprehending it, she could not control the feeble faculties of her mind, so as to enable her to execute her intention, then she was not capacitated to make her will; it matters not whether such incapacity was the effect of a disordered or an enfeebled intellect. But although the numerous authorities, in our own and other courts, touching the subject of testamentary capacity, were ably reviewed and criticised by counsel in this case, I deem it unnecessary to do more than adopt for my guide, in this investigation, the rule laid down by Judge Washington, in *Den* v. *Vancleve*, in the Circuit Court of the United States for this district. That rule has been approved and acted upon by my predecessors; it com-

mends itself to my own judgment, and I do not feel willing, nor is it necessary in the present instance to question its propriety or complain that it is not sufficiently rigid in the standard it fixes for the mental capacity of a testator. "He must," in the language of the law, "be possessed of sound and disposing mind and memory. He must have memory; a man in whom this faculty is totally extinguished cannot be said to possess understanding to any degree whatever or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease; he may not be able at all times to recollect the names, the persons, or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered, and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possibly have often thought of, and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. The question is not so much what was the degree of memory possessed by the testator as this—had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligible form, were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed his will?"

Was the decedent of disposing memory? It is a most singular fact, that here was an aged female—you may with some propriety say *alone* in the world, declining in health during the last eight years of her life—managing by her own judgment, discreetly and most successfully, a large landed and personal property—transacting business with individuals in all situations in life—visiting and visited by

friends near and distant—taking a deep interest and min-
gling in neighborhood affairs—participating in controversies,
both of church and state—executing five different wills, and
naming in each of them, by their proper names, upwards of
twenty-six blood relations, some of them as distant as grand-
nephews and grand-nieces—and yet, in the volume of evi-
dence taken, not one single instance testified to, with any re-
liable certainty, where she manifested even an inaccuracy of
memory. It is true it was argued, that having made no
mention in her will of any of the seven children of her de-
ceased sister, Huldah Coe, while all others of her living sis-
ters as well as brothers, and the representatives of such as
were deceased, are remembered and referred to, is evidence
of a failure of memory, even as to those who were proper
objects of her bounty. But the same omission occurs in a
will which she executed in 1843, and also in the three inter-
mediate wills between that and the one now propounded for
probate. The fact of the omission is accounted for. Her
sister, Huldah Coe, left this part of the country more than
fifty years ago, and had not been seen by the decedent during
that long period; and I believe there is no evidence of her
ever having even seen any of Mr. Coe's children, except one
of them, Mrs. Bennett. Her declarations to the Rev. Mr.
Underwood, that it never was the intention of her husband
that Silas Horton should have the place, and that it had
never been her intention, though not true in point of fact, is
easily explained, I think, in a more plausible manner than
by attributing to her any failure of memory in these par-
ticulars. As to her showing a want of memory in reference
to the extent of her estate at the time she executed the
writing in question, I shall have occasion to refer to this fact
at another place in this opinion, I will only say here I do not
think the evidence justifies the conclusion attempted to be
drawn from it.

I will now examine the particular portions of the evidence
relied upon as showing the incapacity of Esther Horton at
the time she executed this writing. I do not consider it out

of place for me to say, that when this case was presented on the argument, nor since, during a laborious investigation which the importance of the case imposed upon me, has the slightest doubt ever crossed my mind as to the capacity of Mrs. Horton to make a will at the time of the execution of the writing in question. This conviction has not abated nor embarrassed my efforts in endeavoring to arrive at the truth of this case. The unusually protracted investigation in the Orphans Court—the decision of that court refusing probate to the instrument—and the confidence assumed by all counsel on the argument—all had their proper influence in leading me not to rely upon my first impressions. A most careful examination of the whole testimony has, however, but confirmed them.

The Rev. Mr. Underwood was the first witness called by the caveators. He expresses no opinion as to the capacity of the decedent to make a will. The question was not asked him by either party. It may be well to say a word here as to the weight to be attached to the opinions of witnesses on the subject of mental capacity. The abstract opinion of any witness, medical or of any other profession, is not of any importance. No judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinions of witnesses, however numerous or respectable. A man may be of unsound mind, and his whole neighborhood may declare him so. But whether that unsoundness amounts to judicial incapacity for the discharge of the important duty of making a final disposal of his property, is a question which the court must determine upon its own responsibility. It does not depend upon the uncertain or fluctuating opinions of witnesses, but is to be ascertained by the court by the application of certain rules of law in the exercise of a sound discretion regulated by these rules. How many in the community would declare a millerite, or a mormon, or an abolitionist unsound in mind? The opinion of a witness must be brought to the test of facts, that the court may judge what estimate the opinion is entitled to. It is proper and legal to

ask a witness his opinion as to the mental capacity of the individual to discharge the duty in question. He must state the facts upon which his opinion is based. The court will judge of the intelligence of the witness upon the subject to which he testifies, and the proper weight to be given to his opinion from the facts and circumstances upon which he founds his opinion.

Had Mr. Underwood testified to the decedent's incapacity, no reliance could properly have been placed on his judgment. He resided some fifty miles distant from her neighborhood, and had not seen her for ten years prior to November, 1852. He details the circumstances of an interview he had with her in the month last named ; and so far from the facts detailed by him having a tendency to bring in question her mental capacity, they show, to any one who has any knowledge of the character of the woman, a mind most remarkably free from the ravages of disease and old age, and with a quickness and shrewdness to accommodate herself to the company she was in, rarely to be found in one in her situation in life. She comprehended at once the object of the visitor. It was ostensibly, and perhaps for the only purpose of speaking to her upon the subject of her religious feelings. Worldly matters were, however, the main topics of conversation, and absorbed all other considerations. When the witness thought proper gently to hint at the judicious arrangement in the disposal of the farm on which she lived, and which he assumed had been made by her, it induced some remarks from her from which the conclusion has been attempted to be drawn that her memory was impaired. She denied warmly that it was ever the intention of her late husband to give the farm to Silas Horton, or that such was ever her own intention. This was not true, either in respect to her late husband or herself. But the further conversation upon the subject, drawn out by the remarks of Mr. Underwood in reply, shows very plainly not that the denial she had made was to be attributed to a decay or failure of memory, but exhibited her fixed determination that she would not be

s*

influenced in the disposition of her property, and that she well understood the neighborhood interest that existed in reference to this subject.   I cannot discover, in the interviews Mr. Underwood had with her, the slightest evidence of feebleness of intellect.   Her memory did not fail her in any particular, although their conversations embraced a variety of subjects.   Distant friends were spoken of, and in her inquiries respecting them she exhibited a strong mind, a memory unimpaired, and good sense.   She inquired of the Rev. Mr. Hewson, who resided in Madison, if he was a friend of the Union.   The witness asked what she meant, if she meant that he was a friend of the fugitive slave law; that he supposed one might be a friend of the Union, and not be a friend of the fugitive slave law, and presumed that Mr. Hewson was not a friend of the fugitive slave law, but was a friend of the Union.   She replied that she did not see how that could be.   This opinion was consistent with her well known and uniform political views.   She exhibited her pride, her self-conceit, her prejudices.   They were all consistent with her natural disposition and character.   They showed, in the language of another witness while speaking of her still later in life, *that she was Mrs. Horton still.*

Doct. Samuel Willet was Mrs. Horton's physician the last nine years of her life, and attended her constantly during her last sickness.   He is the most important witness in opposition to the will, and his testimony is justly entitled to great consideration.   He says the decedent was a woman of good mind—she was blind the last three or four years of her life, the natural effect of which was to make her disposition irritable; her disease would not have that effect, nor was it calculated to disturb her mind; it was chronic bronchitis, which turned to consumption, and terminated in her death.   He says that, during the last two or three months of her life, she became more irritable and restless, and that during "her poorly turns" she would be a little delirious *at times.*   This he discovered several times—once in particular about the 23d of January.   When asked to state how she manifested this de-

lirium, his reply was, that "she appeared, when speaking, to forget the subject she was upon, and spoke on different subjects; her mind appeared to be wandering, wishing to state something, and could not recollect what she wanted to express." Again, he says, "she appeared at all times to be very forgetful—some little derangement every poorly turn—sometimes two or three weeks would intervene. I could not at any time depend upon her answers to questions put to her. On asking Mrs. Horton a question, I would look at the nurse. If Mrs. Horton answered the question correctly, she would signify it by a nod of the head; this was in the latter stage of her case, the principal part of the month of January."

Several significant questions were put to the doctor as to the mental capacity of the decedent, and in order fully to appreciate the answers, it is requisite to have the relative questions and answers in juxta-position. He was asked—Q. From the examination you made of her, as her physician, and from your observation of the effect of her disease upon her, had she or not, in your opinion, at any time after the first of December, A. D. 1851, a sound and disposing mind and memory? A. I could not say, from the examination that I made, that she had a sound mind, and her memory was defective, or deficient, I meant. Q. Had she, or not, in your opinion, sufficient mind and memory to understand the relative situation of her connections, and the general extent and value of her property, during the last two or three months of her life? A. From the questions put, and the answers received, during the months of October and November, her mind and memory were not good, or were more deficient, I ought to have said, than they were three months previous; and in the months of December and January the change of mind and memory had been still more, or was still more deficient. Q. Had the change of mind and memory, in your opinion, during the months of December and January, been such that she could or could not understand the relative situation of her connections, and the general extent and value of her property? A. I should suppose, in her situation, it would be very diffi-

cult for her to recollect all her connections, and to make a correct estimate of her property."

Upon these answers of Doct. Willet no judicial tribunal would be justified in deciding against the general capacity of the decedent to make a will. His testimony is only to the effect, that at times she was delirious; that her mind was unsound and her memory deficient. But it is not a mere unsoundness of mind, or a memory impaired, that constitute that mental incapacity which will deprive a person of disposing of his property. In the rigid examination of Doct. Willet there is no fact stated by him to show that the decedent's mind or memory was *permanently* impaired. It is true there was delirium and a defect of memory, but only *temporary* in their character. In her extreme sickness her mind was wandering, and the only defect of memory which the doctor specifies is, that he could not depend upon her answers to the questions as to her health and pains, ordinarily put by a physician to his patient. No instance of forgetfulness, as to her numerous family connections and friends, or of the neighborhood matters, in which she had manifested a deep interest, and which were the frequent topics of her conversations, is mentioned by the doctor or by any one else. On cross-examination, Doct. Willet says: "this slight delirium that I spoke of was produced by fever or febrile action, and passed off as the fever declined."

But, in addition to all this, Doct. Willet testifies as to the situation of the decedent on the very afternoon that she executed this paper, and proves conclusively that, according to the estimate he made of her character, she was, in the eye of the law, capable of making a will. While Judge Logan was drafting the will, Doct. Willet went in. The decedent had then been up for several hours engaged in preparing and consulting about the paper. When the doctor went in, he said something about intruding. Mrs. Horton said he was not, and asked him to take a chair. He asked her how she was, and felt her pulse. He says, "I did not think she had any fever when I examined her; her pulse was feeble, and I

advised her to take wine. I was certain she had no fever when I examined her. I did not discover anything different in her appearance at that time. I did not discover anything like delirium in the few minutes that I was in the room."

I consider Doct. Willet a strong witness in support of Mrs. Horton's capacity, at the time, to make a will. It is true, he says, he considered her insane in reference to certain church matters. If he was right in this, there were many more insane persons in that neighborhood besides Mrs. Horton. But I think I may safely say there is room for two opinions, not only as to whether Mrs. Horton was insane, but whether she was right or wrong in her judgment as to the church difficulties referred to. But I shall have occasion, in another part of the case, to refer to these matters.

Lydia Ann Coleman, another witness against the probate, testifies to several instances to show the unsoundness of mind of the decedent. For the first time, in the fall of the year before decedent's death, she noticed something strange and out of the way, and she details the circumstance as follows : " Last fall was the first that I noticed ; we were on a ride to the plains; she wanted that I should stop the horses; I *done* so, and asked her what she wanted; she asked me where I was taking her to; I told her to the plains; she said I was not, that I was taking her in the woods—she said she had one girl drive her in the woods to murder her or to rob her —it was with difficulty that I got her to go any further ; she insisted on going back, and sat for some time before I could get her to go any way; she finally concluded to go to the plains. She would repeat over a line out of the bible, and then one out of the hymn book, and in a few minutes she would spell a word, and then put one out for me to spell." The witness mentions two other instances of supposed aberration of mind—one, in which the old lady insisted that a Sharon tree, which had formerly stood by the corner of the house, was a dahlia, and had been destroyed by her nephew and his wife; and the other, in which she insisted that her

nephew had grown so thin as to become a mere skeleton in appearance.

Admitting these instances of unsoundness of mind in all their force, and without any explanation, they only show temporary derangements, transitory in their nature, and very far removed from that degree of unsoundness of mind which will disqualify the individual from the exercise of a testamentary privilege. But in connection with the fact that, in a life of more than seventy years, these are the only instances in which similar peculiarities of insanity were exhibited, and these before one witness only, they throw no light upon the subject we are investigating. They look to me more like sallies of pleasantry on the part of Mrs. Horton than the evidences of her insanity of mind.

Thomas K. Leek saw the decedent on the 26th or 27th of December preceding her death. She sent for him to come and see her. She wanted to lease to him her farm on which she resided. They had considerable conversation together upon that and other subjects. She said or did nothing which the witness relates, during the interview, to lead any intelligent man to doubt her sanity. The witness, however, says, that he made no bargain with her about the farm, because he did not consider her at that time capable of doing business. Upon being cross-examined, the witness admitted that immediately after his interview with the old lady, upon being asked why he did not take the farm, the reason he gave was that he could not make a satisfactory arrangement about the farm-house. He admits, that in conversing with his neighbors upon the subject of the interview, he never gave the reason for not taking the farm, now for the first time alleged in his examination. He never expressed his opinion to any one of the incapacity of Mrs. Horton at that time, or that the interview he had with her excited any such suspicion in his mind upon the subject.

Elisha Skillinger, another witness of the caveators, appears to be a man of intelligence, and one whose position towards Mrs. Horton would afford him some opportunity of

forming an opinion as to the state of her mind. Speaking of an interview with her in January preceding her death, he does not venture the opinion that she was not of sufficiently sound mind and memory at that time to make a will. The furthest he is willing to go is to say, that he thought, at the time, that she was not in a condition to reason clearly, and likewise that she was strongly prejudiced. Mr. Skillinger differed with her in church matters. They belonged to different parties in the church. He went to reason with her upon these difficulties, and to disabuse her mind in reference to some of them, in regard to which he supposed she had conceived wrong impressions. After a long and exciting conversation, in which she exhibited much feeling, the judgment of the witness, as to her mental faculties, was that of an intelligent and judicious man—not that she was insane, but that she was greatly prejudiced, and not in a condition to reason clearly. The testimony of this witness is very important. The time he speaks of was two or three days before the decedent signed the writing in dispute. It is the same time at which Lydia Coleman represents her as most feeble in mind and body. The evidence of Mr. Skillinger shows that the great debility of body and weakness of mind, which Lydia Coleman represents Mrs. Horton to have exhibited at this time, must have existed only at intervals. The long and exciting conversation, or controversy it may most properly be called, which Mr. Skillinger refers to as having taken place, was calculated to try the nerves, and the strength both of body and mind. It is impossible that there could have been any permanent decay of memory, and not have exhibited itself then. Matters of an exciting character, running through a period of eight years, were talked over and discussed. Men and their transactions were named and talked about, and yet the witness does not mention or intimate that Mrs. Horton betrayed the least weakness of memory or any evidences of insanity. There is much satisfaction in meeting with a witness like this. His feelings are one way, but he

remembers his responsibility as a witness, and will not permit his judgment to be warped by his partialities.

There were seven other witnesses examined against the will. They are witnesses whose opportunity of judging as to the decedent's capacity was by no means as good as that of the witnesses we have particularly referred to; they state no facts of importance, and I do not think it necessary, therefore, to examine their evidence.

Upon a careful examination of all the evidence offered by the caveators against the probate, I do not think there is a doubt cast upon the general capacity of the decedent to make a will at the time this paper was executed.

The evidence of the witness to the execution of the paper propounded, and that of other witnesses examined to support the decedent's capacity, is most satisfactory and conclusive on the point. Three witnesses were present at the execution of the writing—the three subscribing witnesses, and Judge Logan, one of the two individuals named as executors. Judge Logan was objected to as incompetent when offered as a witness before the Orphans Court. The objection was overruled, and his testimony was taken, and reduced to writing with that of the other witnesses examined. No objection was made to reading his evidence on this appeal; indeed, it was used and relied upon by the appellees to sustain their views of the case. I am not called upon, therefore, to decide whether a person who is named as executor in a will is competent as a general witness to sustain it upon a caveat filed against its admission to probate.

It is hardly necessary for me to advert to the particulars of the testimony of the witnesses upon the subject of capacity. The facts and circumstances they state prove, as clearly as the fact could be established by human testimony, that Esther Horton, at the time she executed the paper, was of sound and disposing mind and memory. There is no way of avoiding the conclusiveness of their testimony upon this subject, except by impeaching it; and that impeachment cannot be by charging the witnesses with forgetfulness, inaccuracy,

or by being biassed by partiality or prejudice, but must convict them of the grossest dishonesty. The counsel met the case boldly, and relied for success upon establishing the dishonesty of every one of the subscribing witnesses, and of Judge Logan, who drew the will.

Who are these witnesses?

William Logan and Nathan A. Cooper are men who have long since passed the meridian of life. They have always enjoyed the confidence of the community in which they lived. They have occupied places of trust under the state government. They have, each of them, by a long life of integrity and usefulness, earned for himself a good name. William Logan takes nothing under this will except as executor, and neither Nathan A. Cooper or any of his connections or friends are directly or indirectly benefited by it. John Vandoren and William I. Topping, though men in an humbler sphere of life, are of good and honest report. They are all of them now charged, not only with perverting the truth, but of entering into a most dishonest and wanton combination. And what is charged as the reward of their iniquity? As to one of them, the mere gratification of revengeful feelings for a supposed injury toward one of the objects of the decedent's bounty. As to another, the paltry commissions of an executorship; and as to the others, no motive can be imagined.

The general character of these witnesses is not impeached; but it is said that the testimony of each of them is inconsistent and contradictory in itself, and that, in detailing the particulars of the same occurrence, they contradict each other. I have been unable, after a most careful scrutiny of the evidence given by these witnesses, and of the particulars in which it is alleged the contradictions and inconsistencies exist, to detect anything calculated to excite a suspicion that either of them is not entitled to the most implicit confidence. There are, it is true, apparent contradictions; but they are such as not in the slightest degree impeach the integrity of the witnesses. Four honest men, in detailing the particulars of a

transaction, which lasted several hours, might naturally be expected to make like variations in their account of what took place. In the leading facts they all agree. In immaterial matters and in the order of occurrences there is some variance. There is enough for criticism, but not enough to excite any surprise that honest, or even accurate men should have made them.

To the question—state what occurred, after you got there—what was said and done by you and Mrs. Horton, as near the order in which it occurred as you can recollect it—Judge Logan replied:

A. When I was about to commence the writing of the will, Mrs. Horton said that she then knew more about what her property was worth than when I wrote a former will for her; then asked me, if I could tell the amount of the inventory that was taken of Mr. Horton's property at the time of his decease; I told her that I could not tell exactly, but that I had an impression that it was about twenty-nine thousand dollars; I said to her, that if she wanted to know the exact amount of that inventory, if Mrs. Stackhouse would open the secretary, I would get the inventory, and know the true amount; I found the inventory, and stated to Mrs. Horton the exact amount; she then said it is as *I, or as we supposed,* I am not certain which she said; she then said that her property was considerably more than she knew it to be when she made her last will, and that she should give it to more heirs than were named in her last will; I then asked her who the additional heirs were to be; she told me that there was a lady living in New York that had been, when she was young, much in her family, but that she was now married; that she had always been a particular friend of the family, and she wished to give her five hundred dollars; she said she had a sister residing in York state that she wished to give one hundred dollars—she said her name was Susan McCollum; she said that she had had another sister that was residing in York state, but that she was deceased, and had left children; I asked her how many children that sister left, and what were their names; she said

Stackhouse v. Horton.

they were the children of her sister, Rebecca Fordyce; I asked her how many children there were, and what were their names —she told me she did not know how many children there were, nor what were their names, but she believed there were four, and she wished them to have a hundred dollars a-piece; she then directed me to divide four hundred dollars equally between the children of her deceased sister; she then said that she wished to give to each of her brothers one hundred dollars; I asked her whether she wished to increase or diminish any of her former bequests to any of the persons named in her former will; she said she did in the case of Phœbe Robeson, her niece; she said that she was satisfied that she had given her much more than she intended to—that she intended to give her less than she gave her sister, Mrs. Atwood; she was satisfied that the will would give her much more; I asked her if that was the only change that she wanted to make from her other will; she said, give to my other heirs the sums that now is named: I don't recollect of any other particular conversation until I commenced writing the will; there had been nothing said at all in relation to her real estate during this conversation: when I commenced writing the will, and came to that part devising the real estate, I said to Mrs. Horton, I devise this real estate the same as in this will (alluding to a former will that was then lying on the table); she replied no—I think it best not to give the farm to that little girl; that she was a going to give her two thousand dollars in money, but she did not think it was fit for her to have the farm; she then said that she was going to give the farm to the two sons of Mrs. Budd, her niece; I then went on and made the devise, and read it to Mrs. Horton; she says no, it is not right; she says, I only intended to give them this farm, and you have given them all my lands; I then said I was not aware that there was any out-lands; she said there was a lot, and, I think, named the number of acres—I think twelve, lying near Mr. Leek's, that she wished to give Archibald Horton; I then took another sheet of paper, left the one that I was writing on, and commenced and wrote the will that is here; during the

writing of the will, when I had devised the real estate to these two young men, I read it to Mrs. Horton, and she said it was right; I then inquired of her who this out-lot was bounded by, to get some description of it; she said it was bounded by lands, I think, of Nathan A. Cooper and Mr. Leek, and it appears to me she mentioned some other person; Mrs. Horton said it would be a suitable lot for Archibald to build a shop upon; that he had been wanting to get a lot on that street to build upon; she said, however, that she wanted to give it to him and his children; she did not want him to have power to sell it, as there was a person in the neighborhood that wanted to buy it, and she did not want that person to have it; after devising to Archibald as it is in the will, I read it to her; she said that was right, as she wished it to be; I then went on and finished the remaining part of the will, giving the personal property as in the will, but I read it to her in portions several times as I went along, as she would inquire of me what I had said, or what language I had used in certain devises; I then would read to her what I had written; after the will was finished, I then read it to her as a whole (except signing it); Mrs. Horton then requested Judge Cooper to go and get the witnesses that have subscribed the will; some time after they came in (I don't know how long) the will was executed by Mrs. Horton, and I left soon after; I would add, that I took the will home with me, at Mrs. Horton's request—she requested me to do so, and I done it; after the will was executed, I took three former wills, that had been placed in my hands by Mrs. Horton, and placed the wills in the hands of Mrs. Horton; when I placed the wills in the hands of Mrs. Horton, she said, why, I directed you to destroy two of these wills; I told her that I knew she did, but we were alone when she told me so, and that I had taken them home, and had brought them, and they were all there at her disposal; she then told me to throw them upon the fire, and burn them up, and I done so; after they had been upon the fire until they were consumed, she inquired if they were burned; one of the gentlemen in the room replied they were in ashes;

she then said, "now I am satisfied," or well satisfied, I don't recollect which expresion it was; I don't recollect anything that took place there after burning of the will—I think I left immediately; when the gentlemen came in they were evidently very cold, for it was a blustering cold night; as soon as they had warmed a little, Mr. Vandoren and Mr. Topping, I think both, went and shook hands with Mrs. Horton; Mr. Vandoren inquired particularly about her health; she told him that she was much better than she had been; she laughed and said, " Mr. Vandoren, I am about what you might call comfortably sick;" I suppose she then said that she was able to be up through the day, and had a tolerably good appetite, and her cough was not so bad as it had been; she said to him that she was sorry to give him so much trouble in coming there to witness her will, and that she was willing to pay him for the trouble; after some further conversation between Mr. Vandoren and Mr. Topping and Mrs. Horton—the subject of that conversation I don't know what it was—it was some neighborly talk, I think—I supposed they had then got warm—I then took up the will, and laid it on her lap, or her hands, as they lay in her lap—I said to her, here Mrs. Horton is your will that I have read to you, and here are the gentlemen that you have sent for to witness it—are you ready to execute it; she replied yes, but had you not better read it to me again, for it is some time since I heard it; I replied to her that I would, if she so requested, but I supposed the will contained what she would not want to make public; she replied that it did, and that if I was sure I had read it to her as it was, it would be better not to read it again, and that she was ready to execute it : she then said that she could not write her name; I told her that I was aware of that, and that her mark would answer just as well; she then asked me if I would prepare the will for her mark, and steady her hand while she made it; I told her I would, and went to the table and wrote " Esther Horton, her mark," as it now appears in the will ; I think I then took a book on which I placed the will, took it to Mrs. Horton with a pen, which I placed in her hand; she

T *

then asked me to guide her hand to where I wanted her to make her mark; I done so, and after she had made her mark, she inquired if it was plain; I told her that it was plain enough; while the will was in that position, I asked Mrs. Horton if she published and declared that to be her last will and testament in the presence of the gentlemen that were there, and if it was her wish that they should subscribe it as witnesses— she replied that it was; she then said, " now I am satisfied, and shall expect you to see my intentions in that will carried out;" *I would here say*, that when Mr. Cooper left for the witnesses, I then took the will and my chair, and sat down by the side of Mrs. Horton; I said to her, Mrs. Horton, you have heard this will read several times, but we are now alone, and I'll read it to you again slow and distinctly, and see if there is no change that you wish made in it; I done so; I read it very slow and very distinctly; when I got through I asked her if there was anything that suggested itself to her mind that she wished changed; she replied no, it was as she wished it; I then asked her if she would not go and lay down, supposing she was tired; she replied no, that she was not tired, and that she had got accustomed to sleeping in her chair; and I advised her to go to sleep, if she could, and I would take a book and read till the witnesses came back; I sat down by the table, and she soon went to sleep, or I supposed she did, and I supposed she slept nearly all the time that Mr. Cooper was gone.

In addition to this, the witness states many other particulars, and gives a great deal of conversation of Mrs. Horton, all confirming the opinion of the witness, that she was at the time of disposing mind and memory. No one, perhaps, had so good an opportunity of forming a correct judgment upon this question as he. He had been and was her confidential agent and friend for more than seven years, had drawn three prior wills for her, and was well acquainted with her temper, disposition, and peculiarities.

The testimony of Logan and of the subscribing witnesses is strongly corroborated by facts and circumstances not contro-

verted by the caveators. With a brief reference to these facts, I shall close this part of the case.

This will was not made in a corner; there was not the slightest concealment about its execution. The business was transacted under the very roof of the man who is loudest in his complaints against it, and whose connection with and interest in the transaction has doubtless occasioned this controversy. That there had been a change in the old lady's feelings towards her nephew, Silas Horton, was well understood in the whole neighborhood. She did not conceal it from him, or his family, or friends. It was a matter of solicitude with them all; and there is enough in the case to show that the change the decedent has made in her will respecting her nephew caused no suprise. The reason for this change was frequently given by the decedent. She said the family did not treat her well. Whether her complaint was well founded, it is unnecessary to inquire. That she had reason to complain of their neglect is very clear from the evidence. Several days prior to the execution of this paper, she had fixed the day when the business was to be transacted. Mr. Cooper was to send for Judge Logan, and they were to attend to the business. Before noon, Mr. Cooper drove up to her door. Jane Crammer, a witness against the will, says she was visiting Mrs. Horton; she looked out of her window, and saw Mr. Cooper, and told her that Mr. Cooper was hitching his horses; she then said she would want the room to herself that afternoon, thus showing her recollection of the engagement she had made several days previous, and her readiness to enter upon the important duty of her appointment. Soon after the arrival of Mr. Cooper Judge Logan arrived, and these two were occupied there the whole afternoon, engaged all the time in the preparation of this paper. Doct. Willet found them there engaged in the business —he seemed to understand its character; expressed no surprise then or at any other time; found the old lady entirely free from fever or excitement; gave her some stimulant to brace her for the occasion, and then left.

Stackhouse v. Horton.

No witness examined ever expressed, and I think I may say with propriety, ever entertained a doubt, until after the death of Mrs. Horton, of her competency to transact her business or to make a will. Her personal property, amounting, as has before been stated, to upwards of $25,000, was in obligations of different amounts against individuals scattered through the country. Her business transactions were necessarily large. She managed them all herself up to the day of her death; she invested her money, and collected the interest, and all her debtors transacted their business with her as a matter of course. Some of them are witnesses in the case. They dealt with her at all times as perfectly competent to transact business, and a single instance is not testified to where the slightest mistake was ever made by her. She was her own receiver and her own paymaster; indeed, in her business transactions she was a most remarkable woman. She kept a day-book of original entries up to within a few days of her death, using such friends to make the entries, from day to day, as happened to be at hand. She, on account of her blindness, was unable herself to make the entries, but they were all made under her own dictation, without the control or advice of any person. The last entries were made in the day-book on the 4th of February, 1852. On that day there are two entries—one of $2, to Doct. Willet, for medical attendance, and the other of $1, for medicines. This was only a day or two before her decease. This day-book shows all the moneys she received, from whom, and on what account, and all her disbursements down to the particulars of payments made for postage. As an instance of her particularity, it was her practice to pay the physician for every visit, as he made it. Doct. Willet says, it was only occasionally that this was neglected, and when it was, the omission was always supplied at the next visit.

In this case there is nothing like *dementia* of old age pretended. Recent impressions and events seem to have had as firm a hold upon her mind as ordinarily with individuals much less advanced in life. Persons and events of early years

were not stamped upon her mind to the exclusion and obliteration of later impressions. Indeed that loss of energy in some of the intellectual operations which is the concomitant of old age was scarcely noticeable in her, and her case, in this respect, is a most remarkable one.

The second objection interposed to admitting the writing to probate is, that the decedent was the subject of *monomania* towards her nephew, Silas Horton.

We have already considered the subject of the general capacity of the decedent, and have reached the conclusion of her general competency. There was no *general* derangement, then, of the intellectual faculties indicating a *mania* rendering the subject incompetent to make a will. Our inquiry must now be limited to the consideration of the proposition, which the caveators have undertaken to establish, that Esther Horton was the subject of a partial derangement of the mental powers affecting her relation to her nephew, Silas Horton, to such a degree as to incapacitate her, in the eye of the law, from making, by will, a final disposition of her property.

In examining this question, it is important that we should consider the connection which existed between Esther and Silas Horton, and ascertain how the fact of Esther Horton's partial derangement, confined to her nephew, can legally affect the disposition of the decedent's estate; for a person may be a monomaniac—the subject of a partial derangement towards a particular individual—and this derangement may be the cause of depriving such individual of the bounty of a testator, which he otherwise would have enjoyed, and yet the will be valid and obnoxious to no principle of law. Instance the case of an individual having two sons, his only heirs-at-law, and a nephew, to whom he is under peculiar moral obligations to leave a liberal portion of his estate. He acknowledges his obligation, and he intends that this nephew shall be an object of his bounty, and shall share with his legal heirs his whole property. He suddenly conceives the notion that this nephew has become a king, or an inheritor of im-

mense wealth, and under this vain delusion he makes his will, leaving his whole estate to his sons, to one of them two-thirds, and the remaining third to the other, the proportion between the two sons being in no wise affected or having no connection with the delusion towards the nephew. Can the validity of such a will be questioned. *Cui bono?* Not by the nephew. The delusion, it is true, has lost to him a valuable estate; but the interposition of a court, by refusing probate to the will, cannot make him an heir-at-law or a participator in the inheritance. Nor can the son who takes the lesser portion of the estate impeach the will, for the delusion in no way affected the disposition made to him.

In this case, if Esther Horton was under a moral obligation to make her nephew, Silas Horton, a devisee or legatee under her will, but was prevented doing so by an insane delusion which had seized upon her mind, and which was confined to Silas Horton alone, the court will not refuse probate to the will on that account, unless, by doing so, it can restore Silas Horton to a position which he has lost by the intervention of the instrument. Silas Horton is not an heir-at-law of the decedent. The inquiry is therefore a proper one, what interest has Silas Horton in the question; and as to the other caveators, did the delusion, if any existed toward Silas Horton, affect in any way the dispositions made by the decedent of her property in respect to them.

Esther Horton was under some obligation to devise the farm which she received by will from her husband to Silas Horton. Her husband had given instructions to the scrivener to draw his will, and to leave the farm to his wife's nephew, Silas. The will was prepared agreeable to such instructions. It was altered, in the particular referred to, upon the solicitations of Esther Horton, and she assured her husband that she would leave the farm to Silas. She intended, until within a few months of her decease, to fulfil this promise. Admitting that she conceived in her mind an unfounded delusion toward Silas, amounting to such a partial derangement of her intellectual faculties as to obliterate all obligation she was under

towards him, and to deprive her of her right reason in everything connected with him, how can this partial derangement disturb this paper writing as her last will and testament? Silas Horton is not one of her heirs-at-law. If this writing is not admitted to probate, Esther Horton died intestate. There is no other paper offered for probate as her last will. It is true she did execute other papers prior to the one in question. But they were all cancelled. They are not offered for proof; and this court is bound to decide upon this paper as involving the question as to whether the testator died intestate or not. There is no other paper that this court can now establish as the last will of Esther Horton, except the one in dispute. There is no other set up or propounded as her last will. It will therefore be of no avail or benefit to Silas Horton for this court to declare that such delusion and derangement as is alleged did exisit. Does any one else show that such delusion affected his interest in the decedent's estate?

Susan McCollum, who caveats against this paper, is a sister of decedent. It is proved that Esther Horton's state of mind towards Silas has in no manner affected her interest. She gets by this will, if sustained, $100. By four other wills, executed by the decedent and cancelled, one as early as 1843, nothing was given to this sister. Aaron Horton, a brother and heir-at-law, gets $100 by this will. Nothing had been given him by any of the prior wills. Curtiss Coe, another heir-at-law, being one of the children of a deceased sister, who also has filed a *caveat*, takes nothing by this will. Neither he, his mother, nor any of the family had been mentioned in any of the wills of decedent. It is proved, as clearly as any such fact can be established, that the feelings of Esther Horton towards her nephew did not in any manner affect these caveators. I feel perfectly satisfied in coming to the conclusion, that if the derangement or monomania towards Silas Horton did exist, as contended for, it is no objection to admitting this writing to probate.

But did any such derangement of mind or monomania

pervade the mind of the decedent as would, under any circumstances, have incapacitated her from making a will?

It is important, in investigating such a question, to distinguish between unreasonable and unfounded prejudices and a derangement of mind.   In the ejectment suit which turned upon Greenwood's will, Lord Kenyon, in his charge to the jury, to be found in *Curteis' Ecc. Rep. vol.* 3, *appendix,* says —"a multitude of instances there have been where men have taken up prejudices against their nearest and dearest relations; it is the history of every week in the year, and the history of almost every family, at one time or other, that harsh dispositions have been made—that unreasonable prejudices have taken place—that one child, standing equally near in blood has been preferred to another; and if once we get into digressions of that kind, then we get upon a sea without a rudder.   Where will you stop?   What partiality will be enough to set aside a will?   And what partiality will you give way to, and say the will is good?   These are questions which the most correct and acute mind that ever addresed himself to the consideration of questions will not be able to settle."

It is alleged that Mrs. Horton was deranged in reference to church matters; that she conceived the notion that Silas Horton was combining with the Rev. Mr. Stoutenburgh, the pastor of the congregational church at Chester, and was squandering certain funds which had been left to the church by her husband; that he and the Rev. Mr. Stoutenburgh were changing the platform, as it is called, of the church, and destroying its usefulness.

Was all this a mere delusion? did it exist only in her imagination, or was there some foundation for the belief she entertained?   For, if there were actual ground for suspicion of an injury, though in fact not well founded, and disbelieved by others, the misapprehension of the fact will not be considered mental delusion, and a will made by a party affected by such suspicion may be valid.   *Greenwood's case,* 13 *Ves. jun.* 89;

3 *Bro. C. C.* 444; *Den* v. *Clark,* 1 *Add.* 274; 3 *Add.* 209; *Heath* v. *Watts, Prerog.* 1798, *Deleg.* 1800.

There was a feud in this church, in which Mrs. Horton took a part. The pastor of the congregation insisted that a colored clergyman from Newark should be permitted to preach. To this there was great opposition, and, with many others, Mrs. Horton was greatly excited, and took part against her clergyman. Nathan A. Cooper, who was then the treasurer of the congregation, and Mrs. Horton belonged to the same party. Silas Horton joined the party of the Rev. Mr. Stoutenburgh. The aunt and the nephew thus became estranged. In February, 1851, Nathan A. Cooper was displaced as treasurer, and Silas Horton elected in his place. This widened the breach, and these, with other matters connected with the subject, induced the belief in Mrs. Horton's mind that they were ruining the church. As to squandering the funds, the history of that matter is this, the husband of decedent had, by his will, bequeathed a legacy of $3000 to this church, with instructions " that it should be placed at interest, secured by bond and mortgage on real estate, and the interest thereof appropriated towards the supporting of the preaching of the gospel in said church." When this fund was received, Nathan A. Cooper was elected treasurer, and took charge of the fund. This fund had been infringed upon to the amount of several hundred dollars, and the deficiency had never been made up. When Nathan A. Cooper was turned out as treasurer, and Silas Horton took his place, Mrs. Horton entertained the belief that they were squandering this fund of $3000 left to the church by her husband. Who has a right, under such circumstances, to say that the conviction upon Mrs. Horton's mind in reference to these matters was the evidence of insanity or derangement? Whether her judgment was right, or her conclusion reasonable, is not the question. But is it at all singular that, under the excitement existing in that congregation in reference to these matters, she formed the judgment that she did? Was not the cause adequate to the effect, and cannot the conclusion she arrived

at be accounted for upon the rational operations of the human mind? Without expressing my own opinion as to her judgment of the course taken in reference to the introduction of a colored person into the pulpit, I think I may safely say, if it is evidence of insanity, more than three-fourths of the people of the state could easily be found insane. And as to her judgment upon the use that the trustees were making of the funds of the church, and its consequences, it was no evidence of derangement of mind, unless it can be shown that it is irrational to form or express an opinion unfavorable to a clergyman or an officer of a church. From the evidence before me, I cannot say that Mrs. Horton showed either a want of judgment or of good sense in relation to these church matters.

As to the declaration of Mrs. Horton, that Silas was not a good farmer; that he was suffering the fences on the farm to go to ruin, and other like declarations, they are all accounted for from the fact of the excitement in church matters, and from her feelings toward Silas in consequence of the part he had taken in them. There is nothing in the objection, that Esther Horton, at the time she executed this writing, was the subject of *monomania* towards her nephew, and that the paper offered for probate was the result of such a derangement of mind.

The only further objection to probate is, that the writing was produced by undue influence, and should be rejected on that account.

This influence is alleged to have been exerted by Nathan A. Cooper. He has no interest in the question of the will of the decedent. The motive attributed for the alleged influence is to gratify his malignity towards Silas Horton. Nathan A. Cooper and Silas Horton were opposed to each other in church matters, and the latter supplanted the former as treasurer of the church. From these facts, the *inference* is first to be drawn that Nathan A. Cooper cherished a concealed spirit of revenge against Silas Horton, for there is no evidence to show that they were not on apparently friendly

terms, or that Nathan A. Cooper ever said or did anything openly that exhibited anything like malice or revenge towards Silas Horton.

Such influence, if any was exerted must amount to fraud. Nothing less can vitiate the instrument. Facts are relied upon from which it is asked that fraud may be inferred. It is proved that a difference existed between Nathan A. Cooper and Silas Horton; that Esther Horton was involved in the controversy, and that she took sides with Cooper; that she and Cooper were on most friendly and intimate terms; that he visited her some four or five times during the three months immediately preceding the execution of the writing; that three days prior to its execution he made her a visit, and an arrangement was then made for the meeting, when the will was executed; that he was present with Judge Logan and Mrs. Horton while the paper was drawn; that he went after two of the subscribing witnesses, and with them witnessed the instrument. It is proved that she declared, upon two or three occasions, that Cooper furnished her with a copy of the "negro resolutions," as they are denominated in the evidence, and that he told her that the Rev. Mr. Stoutenburgh was squandering the church funds. There is no proof that she at any time consulted with him as to the disposition of her property, or that he ever advised her to make the disposition of it she did; that he ever spoke to her about Silas Horton in reference to her estate, or unkindly about him in reference to any other subject. There is no proof that he ever at any time said one word to her that influenced her in the disposition of her property. Judge Logan testifies that Mr. Cooper was there during the whole afternoon while the will was being drawn, but that he was not consulted, and that he did not give any advice, or interfere in any way with the business. There is no evidence to justify the belief that Mr. Cooper exerted any improper influence over Mrs. Horton in reference to the disposal of her property or the execution of this paper. He had a right to advise her, if his advice was asked. He was her friend and neighbor. If he did

advise her, it is not to be *presumed* that he deceived her, or took an undue advantage of his friendly position. No such influence can fairly be drawn from the facts proved in this case. I feel bound to say, in justification of Mr. Cooper, that there is nothing proved in this case that ought for a moment to shake any one's confidence in him as an honest man. There is not the slightest ground for the objection to the probate, that the instrument was procured by improper or undue influence exerted by Nathan A. Cooper.

As to the costs, the order made by the court upon the administrator *pendente lite* for the fees of the judge cannot be sustained. By law, the extent of compensation allowed the judges is $50 each, and no larger amount can lawfully be taken out of the estate. If there is any agreement, as the order sets out, entitling them to a larger amount, they must look to the parties who made the agreement. After letters testamentary are issued, the executors must allow to the administrator *pendente lite* no larger amount than $50, each, for the judges. The charge of $20 to the surrogate for reading the depositions is not warranted by law, and is disallowed. In paying the costs and expenses, the appellants and executor must be allowed their expenses, taxed costs, and reasonable counsel fees. The executors must first charge them upon the residuary estate, and make up the deficiency out of the legacies to the caveators. If any further deficiency, the other legacies must abate proportionably.